**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DASEAN DAMONT MORRIS | : | |
| | : | |
| Appellant | : | No. 1060 MDA 2022 |

Appeal from the Judgment of Sentence Entered June 6, 2022
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0004509-2020

BEFORE:  PANELLA, P.J., OLSON, J., and DUBOW, J.

MEMORANDUM BY OLSON, J.:                 **FILED: MAY 3, 2023**

Appellant, Desean Damont Morris, appeals from the judgment of sentence entered in the Court of Common Pleas of York County on June 6, 2022, as made final by the denial of his post-sentence motion on June 17, 2022.  On appeal, Appellant challenges the trial court's order denying his motion to suppress.  We reverse the trial court's suppression ruling, vacate Appellant's judgment of sentence, and remand for further proceedings.

The following facts were revealed at the May 12, 2021 suppression hearing.  On August 18, 2020, Officer Chris Martin and his partner, Officer Harris,[1] were "assigned to roving patrol detail" in York City, Pennsylvania.  N.T. Suppression Hearing, 5/12/21, at 6.  At approximately 4:00 p.m., the two officers were traveling in a marked patrol vehicle "in the east end of the

_____

[1] Officer Harris's first name is not of record.

[c]ity," "heading northbound on Pattison Street." ***Id.*** At that time, the officers observed Appellant traveling southbound on Pattison Street in a blue Toyota Corolla with a Florida license plate. ***Id.*** at 7.

Upon observing Appellant and his Corolla, Officer Martin "made a U-turn" and began to travel southbound on Pattison Street. ***Id.*** at 8. As Officer Martin turned, Appellant "made a right-hand turn onto Prospect" Street and then turned onto Courtland Street. ***Id.*** When Appellant turned onto Courtland Street, Officer Martin noticed Appellant "gain[] speed" but, eventually, lost sight of the Corolla. ***Id.*** at 9. Shortly thereafter, Officer Martin located the Corolla, parked and empty "at the northwest corner" of the South Street and Gerard Street intersection. ***Id.*** at 10. The officers also spotted Appellant "walking westbound from the vehicle, maybe two or three-car lengths" away from the Corolla. ***Id.*** The officers identified Appellant after he "looked over his shoulder" at them. ***Id.***

The officers pulled up next to Appellant, exited their vehicle, and commanded Appellant to stop.[2] ***Id.*** at 56. Appellant complied. ***Id.*** Officer

_____

[2] Appellant testified at the May 12, 2021 suppression hearing and explained the circumstances of the initial stop. In particular, Appellant explained that he was "walking up the street" and then heard Officer Harris say "hey, hey hey, can you stop?" N.T. Suppression Hearing, 5/12/21, at 56. Per Appellant, he stopped in response to the officer's command. ***Id.*** Officer Martin was specifically asked about the circumstances of this encounter with Appellant but stated he did not recall "whether [he] or [Officer Harris] attempted to get [Appellant's] attention" prior to turning on his body camera. ***Id.*** at 52. Officer Martin also testified that he did not turn on his body camera until after he made contact with Appellant. ***Id.*** at 46-47. Our review of the body camera
*(Footnote Continued Next Page)*

Martin asked Appellant for his name. *Id.* Appellant responded that his name was "Sean" but refused to provide his last name. N.T. Preliminary Hearing, 9/25/20, at 6.[3] During the interaction, the officers noticed "a faint smell of unburn[ed] marijuana." *Id.* at 7. At that time, the officers placed Appellant under arrest. *Id.* Appellant then informed the officers that he had a gun in his right front pocket. *Id.* A subsequent search of Appellant's person revealed a firearm and a small amount of marijuana. *Id.* at 7-9.

The Commonwealth charged Appellant with firearms not to be carried without a license and possession of marijuana. On November 19, 2020, Appellant filed an omnibus pre-trial motion seeking to suppress the evidence obtained pursuant to the search of his person, arguing that the officers detained him "illegally without reasonable suspicion of criminal activity and without probable cause." Appellant's Omnibus Pre-Trial Motion, 11/19/20, at

_____

footage supports Officer Martin's testimony. Hence, Appellant's testimony regarding the circumstances of the encounter with police was uncontradicted by the Commonwealth's evidence and the testimony of the Commonwealth's witnesses. *See Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015) ("When reviewing the rulings of a suppression court, [the appellate court] considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole."), *quoting Commonwealth v. Johnson*, 33 A.3d 122, 125-126 (Pa. Super. 2011).

[3] The Commonwealth admitted the transcripts of the September 25, 2020 Preliminary Hearing as an exhibit during the May 12, 2021 suppression hearing. *See* N.T. Suppression Hearing, 5/12/21, at 16; *see also In re. L.J.*, 79 A.3d 1073, 1087 (Pa. 2013) (holding that the scope of review from a suppression ruling is limited to the evidentiary record created at the suppression hearing).

2. A suppression hearing was held on May 12, 2021, during which Officer Martin and Appellant testified. **See** N.T. Suppression Hearing, 5/12/21, at 1-66. On June 4, 2021, the trial court denied Appellant's motion. Trial Court Order, 6/4/21, *1-*3 (unpaginated).

On June 6, 2022, the Commonwealth withdrew the marijuana possession charge and the case proceeded to a stipulated bench trial. That same day, the court found Appellant guilty of firearms not to be carried without a license[4] and sentenced him to two to four years' incarceration. On June 16, 2022, Appellant filed a post-sentence motion. On June 17, 2022, Appellant's counsel filed a motion to withdraw as counsel. That same day, the court denied Appellant's post-sentence motion and granted counsel leave to withdraw. This appeal followed.[5]

---

[4] 18 Pa.C.S.A. § 6106(a).

[5] The trial court denied Appellant's post-sentence motion on June 17, 2022 and, as such, Appellant was required to file his notice of appeal on or before July 18, 2022. **See** 1 Pa.C.S.A. § 1908; **see also** Pa.R.A.P. 903(a) (explaining that an appellant has "30 days after the entry of the order from which the appeal is taken" to file an appeal). Appellant's notice of appeal is time-stamped July 19, 2022. Appellant, however, is incarcerated and filed his notice of appeal *pro se*. Under the prisoner mailbox rule, the filing date for a submission by an incarcerated *pro se* party is measured from the date the prisoner placed the filing in the institution's mailbox. **See Commonwealth v. Patterson**, 931 A.2d 710, 714 (Pa. Super. 2007) ("Pursuant to the prisoner mailbox rule, we deem a document filed on the day it is placed in the hands of prison authorities for mailing."). Appellant's certificate of service indicates that he placed the *pro se* notice of appeal in the institution's mailbox on July 14, 2022. The Commonwealth has not challenged the certification. We therefore conclude that Appellant's notice of appeal was timely filed on July 14, 2022. On July 25, 2022, the trial court ordered Appellant to file a concise
*(Footnote Continued Next Page)*

Appellant raises the following issue on appeal:

[Whether the trial court erred in denying Appellant's omnibus pre-trial motion to suppress evidence?]

*See generally* Appellant's Brief at 4.

Herein, Appellant argues that the trial court erroneously denied his suppression motion. In its order denying suppression, the trial court held that Appellant's initial seizure was constitutional because "the [o]fficers had reasonable suspicion to [] stop [Appellant]." Trial Court Opinion, 6/2/21, at *3 (unpaginated); Trial Court Opinion, 8/19/22, at 4. In support of this conclusion, the trial court cited the fact that "the [o]fficers observed [Appellant's] vehicle begin to lean while making a turn at an unsafe rate of speed, in violation of the [Motor Vehicle Code ("MVC")]."[6] *Id.* The trial court also concluded that, following Appellant's initial seizure, the "[o]fficers had probable cause to make an arrest" because Appellant "refused to provide his full name" and because the "[o]fficers could smell unburn[ed] marijuana coming from [Appellant]." *Id.* Based upon the foregoing, the trial court

---

statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 19, 2022. All issues raised on appeal were included in Appellant's concise statement.

[6] The trial court did not set forth the particular section of the MVC that Appellant violated. The Commonwealth, however, both in its response to Appellant's omnibus pre-trial motion and on appeal, argued that Appellant violated 75 Pa.C.S.A. § 3361, Driving Vehicle at Safe Speed. *See* Commonwealth's Response to Omnibus Pre-Trial Motion to Suppress, 5/24/21, at *4 (unpaginated); *see also* Commonwealth Appellate Brief, 12/2/22, at 12, 14, 16 and 19-20.

denied suppression, holding that the firearm and marijuana were obtained *via* a constitutional search "incident to [a] lawful arrest." **Id.**

On appeal, Appellant points out that, in reviewing the constitutionality of a traffic stop, the trial court wrongly applied a reasonable suspicion standard, as opposed to a probable cause standard, which is required to conduct a lawful vehicular detention for suspected violations of the MVC. Appellant's Brief at 24. In addition, Appellant maintains that, when viewed under a probable cause standard, his seizure for an alleged MVC infraction was not justified. **Id.** at 26-31. Appellant thus concludes that the trial court erred in failing to suppress evidence, including a firearm and marijuana, which was seized after a subsequent, and constitutionally unsupported, police interaction. **Id.** at 31-32. We agree.

Our standard of review for an order denying a motion to suppress is well established.

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, "whose duty it is to determine if the suppression court properly applied the law to the facts." Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. Mbewe***, 203 A.3d 983, 986 (Pa. Super. 2019), *quoting*

***Commonwealth v. Kemp***, 195 A.3d 269, 275 (Pa. Super. 2018).

Initially, we consider Appellant's claim that the trial court applied the wrong constitutional standard in assessing the validity of the traffic-related stop in this case. With respect to vehicle stops based on suspected violations of the MVC, Section 6308(b) of the MVC provides:

> **(b) Authority of police officer**.—Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b).

In ***Commonwealth v. Feczko***, 10 A.3d 1285 (Pa. Super. 2010), this Court explained the state of the law with respect to vehicle stops:

> Traffic stops based on a reasonable suspicion[,] either of criminal activity or a violation of the [MVC] under the authority of Section 6308(b)[,] must serve a stated investigatory purpose. [***Commonwealth v.***] ***Chase***, 960 A.2d [108,] 116 [ (Pa. 2008)].
>
> Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation. In such an instance, "it is encumbent [sic] upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code." [***Commonwealth v. Gleason***, 785 A.2d [983,] 989 [(Pa. 2001)].

*Id.* at 1291. "Accordingly, when considering whether reasonable suspicion or probable cause is required constitutionally to make a vehicle stop, the nature of the violation has to be considered." ***Commonwealth v. Salter***, 121 A.3d 987, 993 (Pa. Super. 2015).

> If it is not necessary to stop the vehicle to establish that a violation of the [MVC] has occurred, an officer must possess probable cause to stop the vehicle. Where a violation is suspected, but a stop is necessary to further investigate whether a violation has occurred, an officer need only possess reasonable suspicion to make the stop.

*Id.*

Here, Appellant was alleged to have violated 75 Pa.C.S.A. § 3361,[7] which states:

> **§ 3361. Driving vehicle at safe speed**
>
> No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, nor at a speed greater than will permit the driver to bring his vehicle to a stop within the assured clear distance ahead. Consistent with the foregoing, every person shall drive at a safe and appropriate speed when approaching and crossing an intersection or railroad grade crossing, when approaching and going around curve, when approaching a hill crest, when traveling upon any narrow or winding roadway and when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions.

*Id.*

Importantly, Pennsylvania case law holds that an officer must possess probable cause, not simply reasonable suspicion, prior to conducting a stop

---

[7] ***See*** Footnote 6, ***supra***.

- 8 -

for a violation of Section 3361 of the MVC. *See Commonwealth v. Smith*, 237 A.3d 580, 583 (Pa. Super. 2020) (noting that the "parties agree[d] that [the police officer] was required to have probable cause before stopping [the appellant] for violation of Section 3361 of the [MVC], Driving Vehicle at Safe Speed, because the stop would not enable the trooper to learn anything more about whether [the appellant] was driving at an unsafe speed"); *see also Commonwealth v. Nell*, 245 A.3d 1067 (Pa. Super. 2020) (unpublished memorandum) (applying a probable cause standard to determine whether the appellant violated Section 3361 of the MVC); *Commonwealth v. Hissim*, 2017 WL 765935, *1, *3 (Pa. Super. Feb. 27, 2017) (unpublished memorandum); *Commonwealth v. Lewis*, 2016 WL 941979, at *4 (Pa. Super. Mar. 11, 2016) (unpublished memorandum) (accord). Based upon the foregoing, we conclude that Appellant is correct that the trial court erroneously examined the validity of the traffic-related stop under the reasonable suspicion standard since probable cause was required.[8] Trial Court Opinion, 6/2/21, at *3 (unpaginated); Trial Court Opinion, 8/19/22, at 4.

Next, Appellant argues that his traffic-related detention was unconstitutional because the officers did not have probable cause to believe

---

[8] The Commonwealth argues that the trial court "correctly applied the standard of reasonable suspicion" to the traffic stop. Commonwealth's Brief at 12. The Commonwealth, however, relies heavily upon this Court's recent decision in *Smith*, 237 A.3d at 583, which clearly states that officers are "required to have **probable cause** before stopping [a] vehicle for violation of Section 3361 of the [MVC], Driving Vehicle at Safe Speed." (emphasis added); *see also* Commonwealth's Brief at 17-18. As such, the Commonwealth's argument lacks merit.

that he violated Section 3361 of the MVC. Appellant's Brief at 26-31. Upon careful review, we agree.

Our Supreme Court has defined probable cause as follows:

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the [stop], and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

***Commonwealth v. Martin***, 101 A.3d 706, 721 (Pa. 2014) (citation omitted).

In ***Commonwealth v. Heberling***, 678 A.2d 794 (Pa. Super. 1996), this Court set forth the criteria for evaluating the sufficiency of the evidence to support a conviction under Section 3361 of the MVC. Notably, the ***Heberling*** Court explained that "speeding alone does not constitute a violation." ***Id.*** at 795. Instead, "a violation depends on the speed in relation to the 'conditions' and 'actual and potential hazards' of the roadway." ***Smith***, 237 3d at 583, *citing* ***Heberling***, 678 A.2d at 795. Said conditions and hazards included, but are not limited to, "the amount of traffic, travel and weather conditions, [and] also the nature of the roadway itself (e.g., whether four-lane, interstate, or rural; flat and wide, or narrow and winding over hilly terrain; smooth-surfaced, or full of potholes; clear, or under construction with abrupt lane shifts)." ***Heberling***, 678 A.2d at 795-796.

This Court has used the criteria set forth in *Heberling* to evaluate whether an officer possesses probable cause to effectuate a stop for violation of Section 3361. *See Smith*, 237 A.3d at 584 (explaining the officer's testimony demonstrating that the appellant was "driving upwards of 70 miles per hour in an area where the limit was 45 or 50 miles per hour" and that such a speed "was unreasonable given the specific conditions of the road" *i.e.*, "'windy, curvy, hilly' with 'lots of intersections' and with houses alongside of it" supported "the conclusion that [the officer] had probable cause to stop [the appellant] for violating Section 3361"); *Commonwealth v. Minnich*, 874 A.2d 1234, 1237 (Pa. Super. 2005) (holding that the traffic stop was supported by probable cause based upon the officer's testimony that, "in a highly trafficked area," the appellant traveled "around a sharp bend" at a "high rate of speed" causing the vehicle to drift "outside its normal lane" which "create[ed] a likelihood of a collision with oncoming traffic around a blind curve").

Here, Officer Martin testified that he and Officer Harris observed Appellant driving southbound on Pattison Street in York City at approximately 4:00 p.m. on a sunny, summer afternoon. N.T. Suppression Hearing, 5/12/21, at 6-8. This area, per Officer Martin, is mixed commercial and residential and the speed limit is generally 25 miles per hour. *Id.* at 7 and 9. Officer Martin also testified that, at the time they encountered Appellant, there was light traffic. *Id.* at 6. Upon seeing Appellant, Officer Martin explained that he "made a U-turn in the middle of Pattison Street" and, "as [he] did that,

Appellant's Corolla made a right-hand turn onto Prospect" Street. *Id*. at 8. After Appellant turned onto Prospect Street, Officer Martin testified Appellant "accelerate[d]" and took a "high speed turn" onto Courtland Street. *Id*. 8 and 38. Officer Martin characterized this turn as "erratic[]" and "careless[.]" *Id.* at 9. Officer Martin, however, could not say whether Appellant was speeding. *Id.* at 9 and 40. In addition, Officer Martin testified that he did not see Appellant "cross any of the white lines dividing the street" or "interfere with any other traffic." *Id.* at 40-41.

Hence, the only reason proffered by Officer Martin as possible justification to initially stop Appellant for violating Section 3361 was the alleged "high speed turn" in which Appellant did not interfere with traffic, run the risk of causing an accident, or otherwise pose a risk to any other person on or around the street. *Id*. at 38. Based upon our review of relevant case law, a single turn at an elevated, but not necessarily unlawful, speed, without more, is insufficient to establish probable cause to support a traffic stop for violation of Section 3361 of the MVC. *See Minnich*, 874 A.2d at 1239 (explaining that the appellant's "single act of 'hugging the east part of the shoulder'" of the road did not provide sufficient basis for the officers to conduct a traffic stop but, when combined with the officer's testimony regarding other actual and potential hazards, there was sufficient evidence that the appellant was "operating his vehicle at an unsafe speed"). We therefore conclude that the officers did not have probable cause to carry out a lawful traffic stop and, as such, did not have probable cause to detain Appellant.

We have concluded that, in issuing its suppression ruling, the trial court erred in applying a reasonable suspicion standard when assessing the constitutionality of Appellant's traffic-related detention because a Section 3361 stop requires probable cause. Upon a review of the record, the facts do not demonstrate probable cause to support a Section 3361 violation. As such, we must now review the record to determine whether any other constitutionally valid police-citizen encounter supported the trial court's decision to deny suppression.

Here, the evidence presented during the suppression hearing demonstrated that, as Officer Martin and his partner were driving northbound on Pattison Street, they saw Appellant driving in the opposite direction in a blue Toyota Corolla. N.T. Suppression Hearing, 5/12/21, at 6-7. Upon seeing Appellant, Officer Martin made a U-turn in the middle of Pattison Street and, as he did so, Appellant turned off Pattison Street, and then turned onto Courtland Street. *Id.* at 8. Officer Martin attempted to follow Appellant but lost sight of the Corolla. *Id.* at 9. Shortly thereafter, the officers located Appellant's Corolla parked legally at the intersection of Girard Street and South Street. N.T. Preliminary Hearing, 9/25/20, at 5 and 12. After spotting the Corolla, the officers also located Appellant "two or three-car lengths from [his] vehicle." N.T. Suppression Hearing, 5/12/21, at 10. Officer Martin indicated that, at the time they spotted Appellant, he "turned around [and] looked over his shoulder at [them]." *Id.* The officers then pulled their marked

police car "up . . . to where [Appellant] was walking," exited the vehicle, and requested him to stop. *Id*. at 42-43 and 56.

Upon review, we conclude that, at the time the officers exited the vehicle and requested Appellant to stop, a relevant encounter occurred. Hence, to determine the requisite level of suspicion required, we must first determine the nature of this interaction. Under Pennsylvania law, there are three categories of police-citizen interactions. As our Supreme Court has clearly articulated:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Gutierrez*, 36 A.3d 1104, 1107 (Pa. Super. 2012), *appeal denied*, 48 A.3d 1247 (Pa. 2012), *quoting Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995) (citations omitted). Further, this Court previously explained:

> [t]o determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officer's request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding

- 14 -

the incident, a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

*Id.*, *quoting* **Commonwealth v. Reppert**, 814 A.2d 1196, 1201-1202 (Pa. Super. 2002).

The testimony elicited at the suppression hearing revealed that, after the officers spotted Appellant outside the Corolla, they pulled up next to him in a marked vehicle, exited the car, and requested Appellant to stop. **See** N.T. Suppression Hearing, 5/12/21, at 56. A review of the body camera footage demonstrates that, upon asking Appellant to stop, the officers immediately directed Appellant to a porch, commanded him to sit down and stood around him, thereby prohibiting him from leaving. **See id.** at Exhibit 2. Based upon the foregoing, we find that Appellant was subjected to an investigative detention at that time. **See Commonwealth v. Cauley**, 10 A.3d 321, 325 (Pa. Super. 2010) (explaining that "'[a]n investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes.' In other words, in view of all the circumstances, if a reasonable person would have believed that he was not free to leave, then the interaction constitutes an investigatory detention.") (quotations omitted); **see also Commonwealth v. Adams**, 205 A.3d 1195, 1201 (2019) (explaining that the appellant was subjected to an investigatory detention after the officer "restrained his freedom to walk away"). Thus, the issue is whether, prior to commanding Appellant to sit down and restraining his ability to leave, the

officers possessed reasonable suspicion that Appellant was engaged in criminal conduct. *See Reppert*, 814 A.2d at 1203 ("Our Supreme Court has mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity.")

"Instantly, [we conclude that] there is not one fact which would give rise to the reasonable belief [Appellant] was involved in illegal activity." *Commonwealth v. Jeffries*, 311 A.2d 914, 917 (Pa. 1973). Indeed, Officer Martin testified that Appellant made a quick turn, and then subsequently parked his car and exited his vehicle. It is apparent from the body camera footage that the officer's considered this activity evasive. *See* N.T. Suppression Hearing, 5/12/21, at Exhibit 2 (revealing the officer's statement to Appellant that they "knew [Appellant] was in that car" and they "knew [Appellant] took off from [them]"). Even if Appellant engaged in unprovoked flight, no facts connected him to criminal activity. Further, there is no indication that Appellant's vehicle was parked in a suspicion manner. To the contrary, Officer Martin specifically stated the vehicle was parked "legally." Preliminary Hearing, 9/25/20, at 5 and 12. Accordingly, even if we were to construe Appellant's actions as evasive or akin to unprovoked flight, such conduct, in and of itself, is insufficient to give rise to suspicion of criminal conduct. *See Commonwealth v. Washington*, 51 A.3d 895 (Pa. Super. 2012) (holding the appellant's unprovoked flight, without more, was

insufficient to give rise to reasonable suspicion justifying an investigatory stop).

We find the Supreme Court's decision in **Commonwealth v. DeWitt**, 608 A.2d 1030, 1033 (Pa. 1992), to be instructive to our present analysis. In **DeWitt**, at approximately 11:50 p.m. two Pennsylvania State Troopers observed a vehicle parked in a parking lot of a church with the interior lights on, but the exterior lights off. **Id.** at 1031. Based on concerns that the vehicle was disabled and due to the church's previous request to check for suspicious vehicles on the property, the troopers pulled up next to the parked vehicle. **Id.** at 1031-1032. Upon doing so, the vehicle's "interior lights were extinguished and the four occupants made 'furtive [] and suspicious movements as if they were trying to hide something.'" **Id.** at 1032. The vehicle also began to pull away. **Id.** The troopers then initiated a traffic stop, approached the vehicle, and discovered alcohol and drugs in plain view. **Id.** The appellant was later charged with various drug violations. **Id.**

"Following a hearing on [the] appellant' omnibus pre-trial motion, the [trial] court suppressed the evidence of illegal drugs and paraphernalia." **Id.** In so doing, the court concluded that "the [troopers] were not authorized to make the stop of the vehicle either as an investigative or traffic stop because they did not have probable cause to believe a traffic violation occurred . . . and there was insufficient evidence to reasonably warrant suspicion of criminal conduct." **Id.** The Commonwealth appealed and this Court reversed the

- 17 -

suppression court's decision. *Id*. **at** 1032, 1034. Our Supreme Court, however, reversed and reinstated the order suppressing the evidence.

In so doing, the Supreme Court initially noted that the stop was not a valid traffic stop because, *inter alia*, the troopers did not have probable cause to stop the vehicle for violating the MVC. *Id*. at 1033. Then, the Court went on to determine whether the stop was otherwise justified, *i.e.*, whether the officers "had sufficient information to reasonably suspect that criminal activity may have been afoot." *Id*. at 1034. Ultimately, the Court concluded that there was "absolutely no evidence" that the vehicle in question was engaged in the type of behavior similar to that previously reported by the church. *Id*. Moreover, the *DeWitt* Court specifically noted the alleged "flight" of the vehicle after the police arrived, "in and of itself," did not give rise to "reasonable suspicion of criminal conduct." *Id*. (citation omitted).

Our Supreme Court reached a similar conclusion in *Jeffries*, *supra*, the facts of which are as follows. On an afternoon in November, four police officers traveling in an unmarked police vehicle "observed Jeffries walking along a public street in Pittsburgh, [Pennsylvania]." *Id*. at 916. When "Jeffries saw the officers, he 'quickened his pace.'" *Id*. The officers "left the police vehicle and started to pursue Jeffries, who then began to run." *Id*. During his flight, Jeffries discarded a cigarette package. *Id*. Jeffries was eventually apprehended and, when the officers retrieved the discarded cigarette package, they discovered it contained several small packages of heroin. *Id*.

Jeffries eventually moved to suppress the evidence of the cigarette package, arguing that the police engaged in an unconstitutional search and seizure. *Id.* The trial court held that Jeffries' flight supplied probable cause to arrest Jeffries. *Id.* Our Supreme Court disagreed and ultimately reversed the trial court's denial of suppression. In so doing, the Court explained that "flight, standing alone . . . is not sufficient to establish probable cause for an arrest." *Id.* at 917. Further, the Court concluded that "there [was] not one fact which would give rise to the reasonable belief that Jeffries was involved in criminal activity" sufficient to support an investigatory detention. *Id.* In particular, the Court found that "Jeffries was simply walking along a public street in Pittsburgh in broad daylight" and, even though he "'quickened his pace' and started to run when the officer[s] began to chase him," such action was "not enough to justify a seizure . . . absent some other factor which would give rise to suspicion of criminal conduct." *Id.*

As in *DeWitt*, the officers in this matter lacked probable cause to believe that a traffic violation occurred. In addition, as demonstrated in *DeWitt* and *Jeffries*, even if we view Appellant's actions (making a quick turn after he saw police, parking the Corolla and exiting the vehicle), as evasive conduct or unprovoked flight, such action, in and of itself, does not give rise to reasonable suspicion of criminal conduct to justify Appellant's non-traffic investigatory detention, rendering Appellant's detention unlawful.

We have reviewed the opinions offered by the trial court in support of its order denying suppression. As discussed above, the trial court examined

and justified Appellant's traffic-related detention under a reasonable suspicion standard. *See* Trial Court Opinion, 6/2/21, at *3 (unpaginated); Trial Court Opinion, 8/19/22, at 4. Building upon this error, the trial court went on to hold that Appellant's arrest was supported by probable cause and the officer's subsequent search of Appellant's person was incident to a lawful arrest. *Id.* The court based its finding of probable cause on Appellant's refusal to provide his full name in response to police questioning in violation of 75 Pa.C.S.A. § 6308, as well as the fact that the officers smelled unburned marijuana on Appellant's person. *Id.* On appeal, the Commonwealth argues that the officers had probable cause to arrest Appellant because his failure to provide his full name violated 18 Pa. C.S.A. § 5101, Obstructing Administration of Law or Other Government Function. *See* Commonwealth Brief at 20-31. Upon review, it appears that the "theories advanced by [the trial court] and the Commonwealth are after the fact justifications," and do not alter our analysis of the constitutionality of Appellant's detention, his arrest, or the search conducted incident to his arrest. *Dewitt*, 608 A.2d at 1033.

As discussed above, Appellant was subjected to an unlawful investigatory detention unsupported by reasonable suspicion when the officers stopped him without first pointing to articulable facts that linked Appellant to criminal activity. Importantly, we note that Appellant's failure to provide his last name, as well as the smell of unburned marijuana, occurred *after* the officers detained him. Therefore, neither circumstance demonstrates reasonable suspicion that Appellant engaged in criminal activity prior to his

detention. **See Reppert**, 814 A.2d at 1203 (explaining that police officers must have reasonable suspicion of criminal activity prior to subjecting a citizen to an investigatory detention).

Second, even if we were to assume Appellant's detention was lawful–which it was not–the evidence presented at the suppression hearing did not support a finding of probable cause to arrest Appellant. Indeed, contrary to the Commonwealth's contentions and the trial court's conclusion, Appellant's failure to provide his full name in response to police questioning is not a violation of 75 Pa.C.S.A. § 6308 or 18 Pa. C.S.A. § 5101. **See Commonwealth v. Shelly**, 703 A.2d 499, 504 (Pa. 1997) (holding that the appellant did not violate the statute prohibiting obstruction of administration of law by giving a false name to police). Furthermore, pursuant to **Commonwealth v. Barr**, 266 A.3d 25 (Pa. 2021), "the smell of marijuana alone cannot create probable cause to justify a search under the state and federal constitutions." **Id**. at 41. The Commonwealth concedes this very point on appeal. **See** Commonwealth's Brief at 28-31.

Herein, the traffic-related stop was invalid, the non-traffic investigatory detention was unsupported by reasonable suspicion, and the discovery of contraband and other grounds cited by the Commonwealth and trial court supporting Appellant's arrest occurred after his unlawful detention commenced. The firearm and marijuana, found as a result of the unconstitutional search and seizure, "was a direct product, and hence, an exploitation of the initial illegality," warranting suppression. **Commonwealth**

- 21 -

***v. Shabezz***, 166 A.3d 278, 291 (Pa. 2017), *citing* **Wong Sun v. United States**, 371 U.S. 471 (1963).  We therefore conclude that the trial court erred in denying suppression.

Judgment of sentence vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2023